## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JOHN HOOVER, SHARON ZEBLEY, ERICK GIBBS,
DARIN GRIFFIN, EDWARD INGLESBY, MATT
MOTTA, FRANK MELCHIORE, DONALD
COSGROVE, BOB FAROHIDEH, TIANA KELLEY,
IMAN JONES, TERRA SCOTT DANNISON, ALVIN
MCCRAY, MICHAEL LEACH, DOUGLAS HOWIE,
SANDRA STYLES HORVATH, VALERY RIVERA,
CATALINA DINOVO, KEVAN WATKINS,
WINFORD HOUSE, PETER ZITOLI, DAVE BARTH,
DANNY BELTRAN, SUE-LING ROSARIO, EVA
CLARK, BARBARA DICKS, MARY FLOYD, DAVID
SEXTON, JEANNINE NOLL, TIFFANY DUKE,
JUSTIN DUKE, BRENDAN PRICE, JAMES MOORE,
and SARA CORCORAN,

     Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD ASS'N, BLUE
CROSS AND BLUE SHIELD OF FLORIDA, INC.,
BLUE CROSS AND BLUE SHIELD OF ALABAMA,
LOUISIANA HEALTH SERVICE & INDEMNITY CO.
d/b/a BLUE CROSS AND BLUE SHIELD OF
LOUISIANA, BLUE CROSS AND BLUE SHIELD OF
MASSACHUSETTS, INC., GROUP
HOSPITALIZATION AND MEDICAL SERVICES,
INC. d/b/a CAREFIRST BLUECROSS BLUESHIELD,
HMO MISSOURI, INC. d/b/a ANTHEM BLUE
CROSS BLUE SHIELD OF MISSOURI, HORIZON
HEALTHCARE SERVICES, INC. d/b/a HORIZON
BLUE CROSS BLUE SHIELD OF NEW JERSEY, BLUE
CROSS AND BLUE SHIELD OF NORTH
CAROLINA, HEALTH CARE SERVICE CORP.
d/b/a BLUE CROSS AND BLUE SHIELD OF
ILLINOIS, and HIGHMARK, INC. d/b/a
BLUESHIELD OF NORTHEASTERN NEW YORK,

     Defendants.

CASE NO.: 1:21-cv-23448

_____/

## COMPLAINT FOR SHERMAN ACT VIOLATIONS AND DEMAND FOR JURY TRIAL

     Plaintiffs, John Hoover, Sharon Zebley, Erick Gibbs, Darin Griffin, Edward Inglesby, Matt

Motta, Frank Melchiore, Donald Cosgrove, Bob Farohideh, Tiana Kelley, Iman Jones, Terra Scott

Dannison, Alvin McCray, Michael Leach, Douglas Howie, Sandra Styles Horvath, Valery Rivera, Catalina Dinovo, Kevan Watkins, Winford House, Peter Zitoli, Dave Barth, Danny Beltran, Sue-Ling Rosario, Eva Clark, Barbara Dicks, Mary Floyd, David Sexton, Jeannine Noll, Tiffany Duke, Justin Duke, Brendan Price, James Moore, and Sara Corcoran (collectively, the "Plaintiffs"), by and through counsel, sue Defendants, Blue Cross and Blue Shield Ass'n, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Alabama, HMO Missouri, Inc. d/b/a Anthem Blue Cross Blue Shield of Missouri, Louisiana Health Service & Indemnity Co. d/b/a Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Inc., Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey, Blue Cross and Blue Shield of North Carolina, Health Care Service Corp. d/b/a Blue Cross and Blue Shield of Illinois, and Highmark, Inc. d/b/a BlueShield of Northeastern New York (collectively, the "Defendants").

## BACKGROUND

1.      As the Supreme Court has explained "[c]ertain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "Output restrictions have [also] been called one of the 'most important *per se* categories,' along with naked horizontal price-fixing and market allocation." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1272 (N.D. Ala. 2018) (quotation omitted).

2.      These prohibitions on *per se* illegal conduct are at the core of antitrust law's protection of our free enterprise system. However, "[i]n this case, a number of these 'most important' *per se* categories of restrictions have been aggregated [by the Defendants]." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1273.

3.      This is an action for damages and injunctive relief for antitrust violations brought by individuals who timely opted out of the settlement reached in the pending class action against the

Defendants in *In re Blue Cross and Blue Shield Antitrust Litigation*, No. 2:13-cv-20000 (N.D. Ala. 2013).

4.      In that action, the Court concluded "that Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the *per se* standard of review." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1279. While the Plaintiffs agree with that ruling, they do not approve of the settlement reached with the Defendants in the class action because it fails to adequately compensate their damages.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the Plaintiffs assert claims under 15 U.S.C. §§ 15 and 26, for injuries sustained by reason of the Defendants' violations of Federal law, 15 U.S.C. §§ 1, 2, and 3.

6.      This Court has personal jurisdiction over each Defendant pursuant to 15 U.S.C. § 22 and/or pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, because the Defendants transact business and/or are found within this District and/or because the Defendants participated in a conspiracy in which at least one conspirator committed overt acts in Florida in furtherance of the conspiracy.

7.      Venue is proper pursuant to 15 U.S.C. §§ 15, 22, and 26 because the Defendants transact business in this District and pursuant to 28 U.S.C. § 1391 because a significant part of the events, acts, and omissions giving rise to this action occurred in the District.

## PARTIES

8.      Defendant, Blue Cross and Blue Shield Ass'n (the "BCBSA") is an Illinois corporation. The BCBSA is owner of the Blue Cross and Blue Shield trademarks and trade names (the "Blue Brand"). The BCBSA is owned, funded, and controlled by the thirty-five (35) independent health insurance companies operating under the Blue Brand in the U.S. (collectively, the "Blue Plans").

9.      Defendant, Blue Cross and Blue Shield of Florida, Inc. ("BCBS-FL") is a Florida

corporation. BCBS-FL is one of the Blue Plans and the health insurance company operating under the Blue Brand in Florida.

10.     Defendant, Blue Cross and Blue Shield of Alabama ("BCBS-AL") is an Alabama company. BCBS-AL is one of the Blue Plans and the health insurance company operating under the Blue Brand in Alabama.

11.     Defendant, HMO Missouri, Inc. d/b/a Anthem Blue Cross Blue Shield of Missouri ("BCBS-MO") is a Missouri corporation. BCBS-MO is one of the Blue Plans and the health insurance company operating under the Blue Brand in Missouri.

12.     Defendant, Louisiana Health Service & Indemnity Co. d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS-LA") is a Louisiana company. BCBS-LA is one of the Blue Plans and the health insurance company operating under the Blue Brand in Louisiana.

13.     Defendant, Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA") is a Massachusetts corporation. BCBS-MA is one of the Blue Plans and the health insurance company operating under the Blue Brand in Massachusetts.

14.     Defendant, Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield ("BCBS-DC") is a Maryland corporation. BCBS-DC is one of the Blue Plans and the health insurance company operating under the Blue Brand in D.C. and its suburbs.

15.     Defendant, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ") is a New Jersey corporation. BCBS-NJ is one of the Blue Plans and is the health insurance company operating under the Blue Brand in New Jersey.

16.     Defendant, Health Care Service Corp. d/b/a Blue Cross and Blue Shield of Illinois ("BCBS-IL") is an Illinois company. BCBS-IL is one of the Blue Plans and the health insurance company operating under the Blue Brand in Illinois.

17.     Defendant, Blue Cross and Blue Shield of North Carolina ("BCBS-NC") is a North Carolina company. BCBS-NC is one of the Blue Plans and the health insurance company operating

under the Blue Brand in North Carolina.

18.    Defendant, Highmark, Inc. d/b/a BlueShield of Northeastern New York ("BS-NE NY") is a Pennsylvania corporation. BS-NE NY is one of the Blue Plans and the health insurance company operating under the Blue Brand in Northeastern New York.

19.    Plaintiff, John Hoover is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since at least 2015, possibly longer.

20.    Plaintiff, Sharon Zebley is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since at least 2008, possibly longer.

21.    Plaintiff, Erick Gibbs is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employers since 2018.

22.    Plaintiff, Darin Griffin is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy from 2016 to 2019.

23.    Plaintiff, Edward Inglesby is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since 2009.

24.    Plaintiff, Matt Motta is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy through his employers from 2009 to 2012 and 2015 to 2018.

25.    Plaintiff, Frank Melchiore is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since 2008 for himself and his wife.

26.    Plaintiff, Donald Cosgrove is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employer since 2010 for himself and his wife.

27.    Plaintiff, Bob Farohideh is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy for himself and his family since 2016 and who also purchased and was enrolled in a BCBS-FL policy through his employer from 2010 to 2019.

28.    Plaintiff, Tiana Kelley is a resident of Florida who purchased and was enrolled in a

BCBS-FL health insurance policy through her employer from 2014 to 2016.

29.     Plaintiff, Iman Jones is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy from 2008 to 2012.

30.     Plaintiff, Terra Scott Dannison is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through her employer since at least 2016, possibly longer.

31.     Plaintiff, Alvin McCray is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employer since 2018.

32.     Plaintiff, Michael Leach is a resident of Florida who purchased and has been enrolled in a BCBS-NJ health insurance policy and later a BCBS-IL health insurance policy through his employers since at least 2008, possibly longer.

33.     Plaintiff, Douglas Howie is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy for many years.

34.     Plaintiff, Sandra Styles Horvath is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since at least 2006, possibly longer.

35.     Plaintiff, Valery Rivera is a resident of Florida who purchased has been enrolled in a BS-NE NY health insurance policy and later a BCBS-FL health insurance policy through her employers since 2011.

36.     Plaintiff, Catalina Dinovo is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy from at least 2008 to 2014, possibly longer.

37.     Plaintiff, Kevan Watkins is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy individually or through his employer since 2011.

38.     Plaintiff, Winford House is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employer since 1996. He also purchased a BCBS-FL health insurance policy for his son who has been enrolled since 2008.

39.     Plaintiff, Peter Zitoli is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employer since 2003.

40.     Plaintiff, Dave Barth is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy through his employer in 2014.

41.     Plaintiff, Danny Beltran is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through his employer since 2015.

42.     Plaintiff, Sue-ling Rosario is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy through her employer from 2014 to 2017.

43.     Plaintiff, Eva Clark is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy through her employer since 2018.

44.     Plaintiff, Barbara Dicks is a resident of Florida who purchased and has been enrolled in a BCBS-FL health insurance policy since 2019.

45.     Plaintiff, Mary Floyd is a resident of Florida who purchased and was enrolled in a BCBS-FL health insurance policy from at least 2008 to 2016, possibly longer.

46.     Plaintiff, David Sexton is a resident of Missouri who purchased and was enrolled in a BCBS-MO health insurance policy from at least 2008 to 2018, possibly longer.

47.     Plaintiff, Jeannine Noll is a resident of Missouri who purchased and was enrolled in in a BCBS-MO health insurance policy individually or through her employer from at least 2008 to 2018, possibly longer.

48.     Plaintiffs, Tiffany Duke and Justin Duke are residents of Louisiana who purchased and were enrolled in one or more BCBS-LA health insurance policies from 2012 to 2018.

49.     Plaintiff, Brendan Price is a resident of Alabama who purchased and has been enrolled in a BCBS-NC health insurance policy and later a BCBS-AL health insurance policy since 2013.

50.     Plaintiff, James Moore is a resident of Massachusetts who purchased and was

enrolled in a BCBS-MA health insurance policy through his employer for himself and his wife from at least 2008 to 2019, possibly longer.

51.     Plaintiff, Sara Corcoran is a resident of the District of Columbia who purchased and was enrolled in a BCBS-DC health insurance policy from 2010 to 2015.

## INTERSTATE COMMERCE

52.     The Blue Plans, which own and control the BCBSA, are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

53.     The Blue Plans provide commercial health insurance that cover residents of their respective bases of operations, which together include all 50 states, D.C., and Puerto Rico. The Blue Plans wield collective nationwide economic power, serving 106 million people—nearly one out of every three Americans—and their provider network includes more than 96% of hospitals and 92% of medical professionals nationwide.

## ALLEGATIONS

54.     The Plaintiffs purchased, enrolled, and were, or in many cases still are, insured under health insurance policies issued by or included in employee benefit plans administered by BCBS-FL, BCBS-AL, BCBS-MO, BCBS-LA, BCBS-MA, BCBS-DC, BCBS-NC, BCBS-NJ, BCBS-IL, and BS-NE NY.

55.     The Plaintiffs have paid substantial sums directly to these entities in the form of inflated premiums and they have paid substantial sums to third party medical providers as result of the Defendants' actions in the form of inflated deductibles, co-pays, and other expenses.

56.     The Defendants have engaged and are still engaging in *per se* illegal market division and *per se* illegal output restrictions. The Plaintiffs seek to enjoin an ongoing conspiracy between and among the BCBSA and the Blue Plans to allocate markets and impose output restrictions in violation of the prohibitions of the Sherman Act.

57.    The conspiracy alleged in this Complaint hindered the development of the health care markets across the nation because the Defendants acted to inhibit lower cost competitors from entry into the marketplace and stifled innovation and consumer choice.

58.    In part through the artifice of the BCBSA, an entity that the Blue Plans created and wholly control, the Defendants have entered into *per se* illegal agreements under the Sherman Act that: (a) prohibit the Blue Plans from competing against each other, when using the Blue Brand, by allocating exclusive territories among the Blue Plans; (b) limit the Blue Plans from competing against each other, even when they are *not* using the Blue Brand, by mandating the percentage of their business that they must do under the Blue Brand, both inside and outside each Blue Plan's exclusive territory; and (c) restrict the right of any Blue Plan to be sold to an entity that is *not* a member of the BCBSA, thereby preventing new entrants into the Blue Plans' markets.

59.    This action seeks to recover damages in the form of supra-competitive premiums that the Blue Plans charged the Plaintiffs as a result of this illegal conspiracy and/or the difference between what the Plaintiffs have paid the Blue Plans and the lower competitive premiums that the Plaintiffs would have been charged but for this illegal conspiracy.

60.    This action seeks to recover damages in the form of supra-competitive deductibles, co-pays, and other expenses that third parties charged the Plaintiffs as a result of the Defendants' illegal conspiracy and/or the difference between what the Plaintiffs have paid those third parties and the lower competitive deductibles, co-pays, and other expenses that the Plaintiffs would have been charged but for this illegal conspiracy.

61.    This action also seeks to recover damages as a result of anticompetitive conduct the Blue Plans have committed in their illegal efforts to establish and maintain market power throughout the regions in which they operate.

**The Blue Plans Formed the BCBSA to Serve as a Vehicle for Competitors to Collude**

62.    The Blue Plans, which arose independently, have their roots in the local community

based health insurance plans formed approximately eighty years ago. Historically the Blue Plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of Blue Plans to compete with or offer coverage in an area already covered by another Blue Plan.

63.     Eventually, to address the increasing competition among the Blue Plans, they sought to ensure "national cooperation" among their different entities. At that time, the Blue Plans were the owners of the Blue Brand. In a coordinated effort to create a national brand, the Blue Plans agreed to centralize their individual ownership of the Blue Brand.

64.     To that end, the Blue Plans jointly created what would eventually become the BCBSA. The Blue Plans then assigned their individual rights in the Blue Brand to the BCBSA. Since that time, the BCBSA is the sole owner of the various trademarks and trade names that make up the Blue Brand.

65.     The BCBSA describes itself as "a national association of 35 independent, community-based and locally operated Blue Cross and Blue Shield companies." In other words, the members of the BCBSA are the Blue Plans, the thirty-five (35) remaining separate and autonomous health insurance companies located throughout the U.S.

66.     The BCBSA itself is not a health insurance company nor does it provide health insurance products and services. Its primary function is as owner and licensor of the Blue Brand. The Blue Plans are the members of, and govern, the BCBSA. The BCBSA is entirely controlled by the Blue Plans, all of whom are independent health insurance companies that license the use of the Blue Brand from the BCBSA, and that, but for any agreements to the contrary, could and would compete with one another.

67.     The BCBSA has admitted that under its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board." The BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote,

the plans could dissolve the Association and return ownership of the Blue [Brand] … to the individual plans." *Cent. Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424–25 (S.D. Ohio 1989).

68.      The Blue Plans collectively govern the BCBSA's affairs pursuant to written bylaws, which they approved by vote. The Blue Plans may amend or repeal the bylaws and adopt new ones by vote. Under these bylaws, the BCBSA is governed by a board of directors.

69.      The BCBSA's board of directors consists of the CEOs of each of the Blue Plans and the president of the BCBSA. By majority vote, the BCBSA's board elects the BCBSA's president on an annual basis, who can also be removed by majority vote. For practical purposes, meetings of the BCBSA's board of directors and its membership comprise largely of the same individuals. Thus, the Blue Plans control the board of directors of the BCBSA.

70.      The Blue Plans control the rules and regulations that all members of the BCBSA must obey. These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards Applicable to Regular Members (the "Guidelines").

71.      The Membership Standards are adopted and amended by an affirmative vote of three-fourths of the Blue Plans and an affirmative vote of three-fourths of the total then current weighted vote of all Blue Plans.

72.      The Blue Plans control the termination of existing members from the BCBSA. The Blue Plans likewise control the entry of new members into the BCBSA. The Blue Plans police the compliance of all members of the BCBSA with the rules and regulations of the BCBSA. The Blue Plans likewise control and administer the disciplinary process for members of the BCBSA that do not abide by the BCBSA's rules and regulations.

73.      "The very existence of the national health insurers against whom the Blue Plans

compete shows that collusion between competitors is *not* essential to the sale of health insurance."
*In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1271 n.15 (emphasis added). Rather, as
alleged, the BCBSA was created to serve as a vehicle for the Blue Plans' anticompetitive collusion.

**The Market Allocation Scheme**

74.     After centralizing ownership of the Blue Brand in the BCBSA, the BCBSA then
licensed the use of the Blue Brand back to the Blue Plans. This was accomplished through the
Licensing Agreements, under which the BCBSA "grants licenses to independent companies [*i.e.*, the
Blue Plans] to use the trademarks and names [only] in exclusive geographic areas."

75.     To use the Blue Brand, each Blue Plan has entered a License Agreement with the
BCBSA. The License Agreements allegedly do not constitute a partnership or joint venture and they
"may be amended only by the affirmative vote of three-fourths of the [Blue] Plans and three-fourths
of the total then current weighted vote of all the [Blue] Plans." Under the terms of the License
Agreements, each Blue Plan "agrees . . . to comply with the Membership Standards."

76.     The motivating factor for the creation of the BCBSA was to reduce or eliminate
competition among the Blue Plans ("Blue on Blue Competition"). The Licensing Agreements reduce
or eliminate Blue on Blue Competition by restricting the use of the Blue Brand to exclusive service
areas ("ESAs"), which are assigned to each Blue Plan.

77.     Each of the License Agreements includes an ESA, a delineated geographic region
within which a specific Blue Plan—and *only* that specific Blue Plan—may use the Blue Brand
without fear of competition from the other Blue Plans. With limited exceptions, the ESAs roughly
correspond to the state that each Blue Plan historically operated in. For example, the ESA for BCBS-
FL is the state of Florida and the ESA for BCBS-AL is the state of Alabama.

78.     Conversely, the Blue Plans have agreed that they may not use the Blue Brand outside
of their ESA and the License Agreements restrict them from doing so absent approval from the
BCBSA and agreement with the affected Blue Plans. For example, BCBS-FL cannot use the Blue

12

Brand outside of Florida and BCBS-AL cannot use the Blue Brand outside of Alabama.

79.     The Blue Plans—independent health insurance companies and competitors—agreed to maintain ESAs when operating under the Blue Brand. In short, the Defendants have agreed with each other to carve up the U.S. into "service areas" in which only one Blue Plan can sell health insurance or administer employee health benefit plans and they may do so free from competition from the other Blue Plans.

80.     The Blue Plans individually and collectively benefit from the ESAs because they eliminate competition from other Blue Plans within their ESA. As one Blue Plan CEO noted, "[Blue] Plans benefit from the [ESAs] because it eliminates competition from other Blue Plans" and that without ESAs, "there would be open warfare." ESAs enable the Blue Plans to maintain "[l]arger market shares because other Blues stay out and do not fragment the market."

81.     "The market allocations at issue are *not* necessary to market, sell, or produce health insurance." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1270 (emphasis added). Rather, as alleged, the origin of the geographic restrictions in the License Agreements was an effort to avoid competition between the various Blue Plans by eliminating Blue on Blue competition.

**The Agreements to Restrict Output**

82.     The establishment of the ESAs in the License Agreements effectively eliminated Blue on Blue Competition. However, the Blue Plans were soon troubled by another development. Originally, the Blue Plans were non-profit entities but in 1986 the IRS revoked their tax-exempt status. Subsequently, most Blue Plans converted to for-profit entities. While a few Blue Plans nominally remain non-profit, they generate substantial earnings and surpluses and in practice operate as for-profit entities.

83.     Following the revocation of their tax-exempt status, many Blue Plans also formed for-profit subsidiaries and affiliates, which do *not* operate under the Blue Brand. Initially, these non-Blue Brand entities competed with the Blue Plans and there were no restrictions on their ability to

compete with or offer coverage in an area already covered by a Blue Plan.

84.     Eventually, the Blue Plans sought to rein in competition between them and the non-Blue Brand entities owned by the Blue Plans ("Blue on Non-Blue Competition"). To do so, "[i]n addition to allocating geographic markets through their use of ESAs, Defendants … developed additional rules which place added restraints on the [Blue] Plans' ability to compete, *and not only with each other.*" *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1272 (emphasis added).

85.     In essence, the Blue Plans agreed to restrict the territories in which they would operate under *any* brand, which was accomplished through the inclusion of two (2) "best efforts" requirements in the Licensing Agreements, extremely limiting their ability to engage in Blue on Non-Blue Competition.

86.     First, the Licensing Agreements were amended in 1994 to impose a local "best efforts" requirement, which requires "[a]t least 80% of the annual Combined Local Net Revenue of a [Blue Plan and any] controlled affiliate attributable to health care plans and related services … offered within the designated [ESA] must be sold, marketed, administered or underwritten under the Licensed Marks and Names [*i.e.*, the Blue Brand]."

87.     In other words, each Blue Plan agrees that at least 80% of the annual revenue that it *or* its subsidiaries generate from within its ESA shall be derived from services offered under the Blue Brand.

88.     Second, the Licensing Agreements were further amended in 2005 to impose a national "best efforts" requirement, which requires "[a]t least 66-2/3% of the annual Combined National Net Revenue of the [Blue Plan and any] Controlled Affiliate[] attributable to health care plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names [*i.e.* the Blue Brand]."

89.     In other words, each Blue Plan further agrees that at least two-thirds of the annual revenue generated by it *or* its subsidiaries from either inside *or* outside of its ESA shall be

attributable to services offered under the Blue Brand. Thus, under the national best efforts rule, any revenue a Blue Plan may generate from services offered under any non-Blue Brand is limited in relation to its Blue Brand revenue.

90.     "The National Best Efforts rule … operates as an output restriction on a [Blue] Plan's non-Blue brand business." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1272. "The fact that the National Best Efforts rule imposes a relative limit, rather than an absolute limit, is of no moment." *Id.* "It constitutes a limit or a restriction on the volume (output) of a [Blue] Plan's non-Blue business." *Id.* The same reasoning applies to the Defendants' local best efforts rule.

91.     Similar to the ESAs, "[t]he National Best Efforts restrictions on non-Blue brand business clearly are *not* necessary for the product to be 'available at all.' Health insurance is regularly made available to consumers without such restraints." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1273 (emphasis added). The same reasoning applies to the Defendants' local best efforts rule.

92.     These provisions directly limit the ability of each Blue Plan to generate revenue from non-Blue Branded business. They also limit the ability of each Blue Plan to develop non-Blue Brands that could and would compete with other Blue Plans. It further discourages and disincentivizes each Blue Plan from developing any non-Blue Branded businesses.

93.     For example, the one-third cap on non-Blue Brand revenue provides a Blue Plan with minimal, if any, incentive to compete outside its ESA. To do so, the Blue Plan would have to buy, rent, or build a provider network under a non-Blue Brand, while ensuring that revenue derived from that brand did not exceed the one-third cap.

94.     Should a Blue Plan offer services and products under its non-Blue Brand within its ESA that would further reduce the amount of non-Blue Brand revenue it is permitted to earn from outside its ESA. Thus, the potential upside of making an investment in developing business outside of a Blue Plan's ESA is severely limited, which obviously creates a disincentive from ever making

that investment.

95.     The combined effect of the ESAs, the local best efforts rule, and the national best efforts rule was to drastically limit the ability of the Blue Plans to compete by eliminating both Blue on Blue Competition *and* Blue on Non-Blue Competition. But for these illegal agreements, the Blue Plans could and would compete with each other through the Blue Brand *and* their non-Blue Brand affiliates. This would result in greater competition and competitively priced premiums and fees for consumers, as well, as in greater consumer choice.

**Anticompetitive Acquisition Restrictions Prevent Outsiders from Acquiring Blue Plans**

96.     In addition to the *per se* illegal market allocation scheme and output restrictions summarized above, the rules and regulations of the BCBSA, which the Blue Plans created, control, and agree to obey, also include provisions adopted in 1996 that restrict the ability of non-members of the BCBSA to acquire or obtain control over any Blue Plan. They also prevent Blue Plans from transferring its license to a non-Blue Plan without meeting certain standards.

97.     First, the rules and regulations prohibit acquisition of a Blue Plan by an outsider entity without the approval of the BCBSA. The Guidelines state that "[n]either a [Blue] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Blue] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Blue] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services [*i.e.*, the Blue Brand]."

98.     Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the Blue Plans control the BCBSA and thus entry of new members into the BCBSA. Should a non-member attempt to join the BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other Blue Plans accordingly may block its membership by majority vote.

99.     Second, the License Agreements contain a number of acquisition restrictions applicable to Blue Plans that operate as for-profits—entities that would otherwise be capable of

having their shares acquired. These include four situations in which a Blue Plan's license will terminate *automatically*: (1) if any institutional investor becomes beneficially entitled to 10% or more of the member plan's voting power; (2) if any non-institutional investor becomes beneficially entitled to 5% or more of the member plan's voting power; (3) if any person becomes beneficially entitled to 20% or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10% or more of the voting power, no non-institutional investor is beneficially entitled to 5% or more of the voting power, and no person is beneficially entitled to 20% of more of the then-outstanding common stock or equity securities.

100.    These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Blue Plans and also of a majority weighted vote of the disinterested Blue Plans. These restraints effectively preclude the sale of a BCBSA member to an outside entity, absent special approval, which has never been granted.

101.    Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Plans have been acquisitions by other Blue Plans. In fact, there has been a wave of consolidation among the Blue Plans since 1996 from 62 to only 35.

102.    These acquisition restraints reduce competition because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blue Plans. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing Blue Plan doing business in that area.

103.    Through the acquisition restrictions, the Blue Plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from

ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue Plan.

104.    By preventing non-members of the BCBSA from acquiring Blue Plans and their networks, the acquisition restrictions effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

105.    By agreeing to restrict the pool of potential purchasers of a Blue Plan to other Blue Plans, the member plans of the BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves from competition. The net effect is less competition and higher premiums and costs for the Plaintiffs and all consumers.

**The Agreements at Issue are Horizontal Agreements Between Competitors**

106.    The Blue Plans are actual or potential competitors that use their control of the BCBSA to coordinate their activities. The BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that the BCBSA "[e]stablishes a common direction and cooperation between [the BCBSA] and the 39 [now 35] Blue companies."

107.    As the BCBSA's general counsel has explained, "BCBSA's 39 [now 35] independent licensed companies compete as a cooperative federation against non-Blue insurance companies. Each of the [now 35] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ." As the BCBSA itself has recognized, the Blue Plans' use of the BCBSA as the licensor of the Blue Brand is illusory.

108.    In fact, the BCBSA serves as the epicenter for the Blue Plans' communications and arrangements in furtherance of their agreements not to compete and to retrain trade. The BCBSA provides a forum for the Blue Plans to share information on their management and specific health insurance issues common to them, and this information is disseminated to all Blue Plans.

109.    Each of the BCBSA's licensees — the Blue Plans — are separate and independent legal

entities. The BCBSA has admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other." As a result, the rules and regulations imposed "by" the BCBSA on its member plans are in truth imposed by the Blue Plans on themselves.

110.    As the foregoing demonstrates, the BCBSA is simply a vehicle used by the Blue Plans—independent health insurance companies—to enter into agreements that restrain trade and competition and to facilitate their ongoing concerted activities to maintain those agreements. Because the Blue Plans possess complete and unfettered control over the BCBSA, any agreement between the BCBSA and the Blue Plans constitutes a horizontal agreement between and among the Blue Plans themselves.

111.    With the foregoing in mind, through the License Agreements, Membership Standards, and the Guidelines, which the Blue Plans created, control, and enforce, the Defendants have divided the U.S. markets for commercial health insurance into ESAs allocated to distinct Blue Plans. Further, the Defendants have restricted output in U.S. markets for commercial health insurance among themselves by agreeing to limit their competition against one another even when *not* using the Blue Brand. In so doing, the Defendants have agreed to reduce or eliminate both Blue on Blue Competition and Blue on Non-Blue Competition.

112.    In sum, the Blue Plans, have agreed with its actual or potential competitors that each will exercise the exclusive right to use the Blue Brand within a designated geographic area (*i.e.*, the ESAs), derive *none* of its revenue from services offered under the Blue Brand outside of that area, and derive *at most* one-third of its revenue from outside of its ESA, using services offered under a non-Blue Brand. The latter amount will be further reduced if the Blue Plan derives *any* of its revenue within its ESA from services offered under a non-Blue Brand.

113.    Consequently, the rules and regulations of the BCBSA, including, but not limited to,

the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors—the Blue Plans—to divide the geographic market for commercial health insurance and to impose restrictions on output, which is a *per se* violation of §§ 1 and 3 of the Sherman Act.

114.     Each of the Defendants entered into a License Agreement with the BCBSA and has enforced the ESAs, the "best efforts" requirements, and acquisition restraints provided by the License Agreements. At all times material hereto, no Defendant competed under the Blue Brand outside of its designated ESA.

115.     Even in the relatively rare instance in which Blue Plans conduct operations outside of their ESAs, they have been required to keep those operations tightly under control by preventing growth—exactly the opposite of how they would normally operate.

116.     The complained of restrictions agreed to by all the Blue Plans operate to restrain competition by preventing them from competing with each other and by preventing them from competing with the non-Blue Brand affiliates, which they own.

117.     These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue Plan into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**The Defendants' Enforce the Horizontal Agreements through Coercion**

118.     To ensure compliance with the anticompetitive restrictions discussed herein, the members of the BCBSA—the Blue Plans—have agreed to impose harsh penalties on those that violate the restrictions. According to the Guidelines, a Blue Plan in violation of one of the anticompetitive restrictions could face "[l]icense and membership termination."

119.     If a Blue Plan's license and membership in the BCBSA are terminated, it loses the use of the Blue Brand. In addition, in the event of termination, a Blue Plan must also pay a penalty exit fee to the BCBSA, which would be used "to 're-establish' a Blue Cross and/or Blue Shield license in

the vacated ESA."

120.     Consequently, a Blue Plan that had its licensee to use the Blue Brand terminated would: (1) lose the brand through which it derived the majority of its revenue; and (2) be required to fund the establishment of a new health insurer, willing to play ball, which would replace it in that particular ESA. These penalties essentially threaten to put out of existence any Blue Plan that breaches the anticompetitive restrictions discussed herein.

**The Horizontal Agreements have Reduced Competition across the United States**

121.     The Blue Plans, as licensees, members, and parts of the governing body of the BCBSA, have conspired with each other to create, approve, abide by, and enforce the rules and regulations of the BCBSA nationwide, including the *per se* illegal market allocation and output restrictions in the License Agreements, the Membership Standards, and the Guidelines.

122.     The Blue Plans include many of the largest commercial health insurance companies in the U.S. As of 2015, fifteen (15) of the twenty-five (25) largest commercial health insurance companies in the country included the Blue Plans. Absent the complained of restrictions that the Blue Plans have chosen to impose on themselves, these companies would compete against each other in the market for commercial health insurance.

123.     Such competition would result in lower health care costs and premiums paid by the Plaintiffs and all consumers, as well as lower fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

124.     The Defendants' conduct has restrained competition, prevented entry by Blue Plans and their non-Blue Brand affiliates into other markets, increased health care costs, inflated premiums and fees, and deprived consumers of the opportunity to purchase health insurance or services in the respective ESAs from one or more additional Blue Plans and/or their non-Blue Brand affiliates, at a lower premium or contractual rate and/or at a price set by a market free from the non-price restraints imposed by the Defendants' anticompetitive agreements.

125.     The anticompetitive restrictions discussed herein reduced or eliminated Blue on Blue Competition and Blue on Non-Blue Competition and, therefore, eliminated the downward pressure on premiums. The Plaintiffs were damaged by paying noncompetitive premiums, which are to be calculated by estimating the premiums that would have been competitively available to consumers but for the antitrust violations complained of herein.

126.     The challenged restraints also limited consumer choice and adversely affected innovation in health care products and services. The challenged restraints, by virtue of eliminating most Blue on Blue Competition and Blue on Non-Blue Competition, reduce incentives to innovate.

127.     Blue on Blue Competition and Blue on Non-Blue Competition would likewise spur innovation in the delivery of health care. Indeed, documentary evidence shows that the Blue Plans do tend to be pushed towards innovation when their competitors force them. Conversely, lack of such competition has had the effect of depriving consumers of these benefits of competition.

128.     The Blue Plans have substantial market power within their respective ESAs throughout the U.S. The restraints summarized above enabled the Blue Plans to entrench and perpetuate those respective market positions, thereby insulating them from competition not only from other Blue Plans but also from the Non-Blue Brand affiliates owned by the other Blue Plans. This was the direct result of the illegal conspiracy to unlawfully divide and allocate geographic markets, restrict output, and limit competition for commercial health insurance in the U.S.

129.     The Defendants' anticompetitive agreements, implementing conduct, and foreclosure of competition have prevented consumers from being offered competitive premium prices. It also prevented consumers from being offered health insurance policies that offered better services and coverage that would result from competition in the marketplace.

130.     None of this would be possible if the market for commercial health insurance in each Blue Plan's ESA was competitively unrestrained. Competition is not possible so long as the Blue Plans and the BCBSA are permitted to enter into agreements that have the actual and intended

effect of restricting their ability to compete with each other, either directly or through their non-Blue Brand affiliates.

131.    The Plaintiffs have retained the undersigned law firm and is obligated to pay reasonable attorney fees for its services.

132.    All conditions precedent to the maintenance of this action have either occurred, been performed by the Plaintiffs, or have been waived.

## COUNT I — CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 AND 3 (AS TO ALL DEFENDANTS)

133.    The Plaintiffs reallege and incorporate by reference, the allegations set forth above in paragraphs 1 through 132 as if set forth here in full.

134.    The License Agreements, Membership Standards, and the Guidelines agreed to by the Blue Plans represent horizontal agreements entered into between and among the Defendants, who are actual or potential competitors in the market for commercial health insurance in the U.S.

135.    Each of the License Agreements, Membership Standards, and the Guidelines entered into between the BCBSA and the Blue Plans represents a contract, combination, and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

136.    Through the License Agreements, Membership Standards, and the Guidelines, the Defendants have agreed to divide and allocate the geographic territories for the sale of commercial health insurance into a series of ESAs for each of the thirty-five (35) Blue Plans. There is little question that, properly analyzed, the ESA rules are a market allocation scheme.

137.    "Furthermore … the Blue Plans have instituted at least two additional restraints of trade along with the ESAs: [referring to the "best efforts" rules] they have limited the output of non-branded health insurance and related health financing products by the licensees within the licensee's service area(s), and they have limited the output of non-branded health insurance and related health financing products by the licensees nationwide." *In re Blue Cross Blue Shield Antitrust*

*Litig.*, 308 F. Supp. 3d at 1269. "[T]here is little question that, properly analyzed, the National Best Efforts rule is an output restriction." *Id.* at 1272. Likewise, the local best efforts rule is also an output restriction.

138.     Thus, the Defendants have conspired to unreasonably restrain trade in violation of §§ 1 and 3 of the Sherman Act. The horizontal market allocation agreements and output restrictions between the Defendants are *per se* illegal under §§ 1 and 3 of the Sherman Act.

139.     In the pending class action against the Defendants, which the Plaintiffs have opted out of, the Court held that "Plaintiffs have presented evidence of an *aggregation of competitive restraints*—namely, the adoption of ESAs and, among other things, best efforts rules—which, considered together, constitute a *per se* violation of the Sherman Act." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1266–67 (emphasis added). "[T]he National Best Efforts rule constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition." *Id.* at 1273.

140.     That ruling, which was affirmed on appeal by the Eleventh Circuit, is *res judicata* for purposes of this action. *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 18-90020-E, 2018 WL 7152887, 2018 U.S. App. LEXIS 36905 (11th Cir. Dec. 12, 2018).

141.     The market allocation agreements and output restrictions entered into between the Defendants, as evidenced by the License Agreements, the Membership Standards, and the Guidelines, are anticompetitive and have had a deleterious impact on interstate commerce.

142.     The conspiracy to allocate markets, restrict output, and restrain trade adversely affected the Plaintiffs and consumers around the nation by depriving them of, among other things, the opportunity to purchase health insurance from a lower cost competitor and/or at a price set by a market free from the non-price restraints imposed by the anticompetitive agreements and of a wider choice of healthcare products and services as well as of increased innovation.

143.     As a result of the Defendants' market allocation agreement, output restrictions, and

related restraints, the thirty-five (35) Blue Plans have not marketed commercial health insurance in other Blue Plans' respective ESAs and have been precluded from doing so by the agreements and restraints discussed herein.

144.    The challenged agreements have had substantial and unreasonable anticompetitive effects, including but not limited to: (a) reducing or eliminating Blue on Blue Competition and Blue on Non-Blue Competition; (b) allowing the Blue Plans to maintain and enlarge their market power in their respective ESAs; (c) unreasonably limiting the entry of competitor health insurance companies into the U.S.; (d) allowing the Blue Plans to supra-competitively raise the premiums charged consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and (e) depriving consumers of the full benefits of free and open competition.

145.    As a direct and proximate result of the Defendants continuing violations of §§ 1 and 3 of the Sherman Act described herein, the Plaintiffs have suffered injury and damage and continue to be threatened with suffering injury and damages in amounts to be proven at trial.

146.    These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive premiums to the Blue Plans. These premiums were higher than the Plaintiffs would have paid but for the Sherman Act violations.

147.    These damages also consist of having paid artificially inflated, unreasonable, and/or supra-competitive deductibles, co-pays, and other expenses to third party medical providers. These deductibles, co-pays, and other expenses were higher than the Plaintiffs would have paid but for the Sherman Act violations.

148.    These damages also consist of being deprived of the opportunity to purchase health insurance from one or more of the other Blue Plans and/or their non-Blue Brand affiliates at a lower premium or contractual rate and/or at a price set by a market free from the non-price restraints imposed by the Defendants' anticompetitive agreements.

149.    These damages also consist of being deprived of the opportunity to purchase health

insurance policies that offered better services and greater coverage that would result from competition in the marketplace. The Plaintiffs have also been deprived of consumer choice and increased innovation.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants as follows:

(a)    finding the Defendants violated 15 U.S.C. §§ 1 and/or 3;

(b)    granting the Plaintiffs treble damages pursuant to 15 U.S.C. § 15(a);

(c)    awarding the Plaintiffs costs incurred in this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 15(a); and

(d)    granting any further legal or equitable relief the Court deems just and proper.

## COUNT II — MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, OR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 2 (AS TO ALL DEFENDANTS)

150.    The Plaintiffs reallege and incorporate by reference, the allegations set forth above in paragraphs 1 through 132 as if set forth here in full.

151.    One of the primary goals of the Defendants' anticompetitive conduct described herein was to create or maintain monopolies in the markets for health insurance and health care services, and thus the Defendants have conspired to monopolize those markets.

152.    In many geographic areas, the Blue Plans have successfully created or maintained a monopoly, or have created a dangerous probability of achieving a monopoly.

153.    BCBS-FL is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Florida. As of 2011, at least 48% of Florida residents enrolled in individual commercial health insurance and at least 28% of Florida residents enrolled in small group commercial health insurance were enrollees of BCBS-FL.

154.    BCBS-AL is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Alabama. As of 2008, at least 93% of Alabama residents enrolled in commercial health insurance, whether through group plans or through individual

policies, were enrollees of BCBS-AL.

155.    BCBS-LA is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Louisiana. As of 2010, at least 73% of Louisiana residents enrolled in individual commercial health insurance and at least 80% of Louisiana residents enrolled in small group commercial health insurance were enrollees of BCBS-LA.

156.    BCBS-MA is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Massachusetts. As of 2011, at least 63% of Massachusetts residents enrolled in individual commercial health insurance and at least 40% of Massachusetts residents enrolled in small group commercial health insurance were enrollees of BCBS-MA.

157.    BCBS-DC is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the District of Columbia and a small portion of northern Virginia. As of 2011, at least 69% of D.C. region residents enrolled in individual commercial health insurance and at least 76% of D.C. region residents enrolled in small group commercial health insurance were enrollees of BCBS-DC.

158.    BCBS-NJ is one of the largest health insurers, as measured by number of enrollees within its ESA, which is defined as the state of New Jersey. As of 2011, at least 63% of New Jersey residents enrolled in individual commercial health insurance and at least 59% of New Jersey residents enrolled in small group commercial health insurance were enrollees of BCBS-NJ.

159.    BCBS-IL is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Illinois. As of 2010, at least 65% of Illinois residents enrolled in individual commercial health insurance and at least 55% of Illinois residents enrolled in small group commercial health insurance were enrollees of BCBS-IL.

160.    BCBS-NC is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of North Carolina. As of 2011, at least 83% of North Carolina residents enrolled in individual commercial health insurance and at least 63% of North Carolina

residents enrolled in small group commercial health insurance were enrollees of BCBS-NC.

161.    BS-NE NY is one of the largest health insurers, as measured by number of enrollees within its service area, which is defined as 13 counties in Northeastern New York. As of 2010, at least 67% of New York residents enrolled in individual commercial health insurance, whether through group plans or through individual policies, were enrollees of BS-NE NY.

162.    BCBS-MO is the largest health insurer, as measured by number of enrollees within its ESA, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and northwest Missouri. As of 2010, at least 32% of Missouri residents enrolled in individual commercial health insurance and at least 48% of Missouri residents enrolled in small group commercial health insurance were enrollees of BCBS-MO.

163.    The License Agreements, Membership Standards, and the Guidelines agreed to by each of the Blue Plans and the BCBSA and the attempts by the Defendants to enforce the policies challenged herein, represent overt acts in furtherance of the Defendants' efforts to monopolize.

164.    By willfully creating or maintaining or attempting to create or maintain a monopoly, the Defendants have violated § 2 of the Sherman Act, which prohibits monopolization of "any part of the trade or commerce among the several States."

165.    The Blue Plans' monopoly power or threatened monopoly power, gained by virtue of the unlawful agreements discussed herein, has harmed all consumers. As a direct and proximate result of the Defendants continuing violations of § 2 of the Sherman Act, described herein, the Plaintiffs have suffered injury and seek damages.

166.    These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive premiums to the Blue Plans. These premiums were higher than the Plaintiffs would have paid but for the Sherman Act violations.

167.    These damages also consist of having paid artificially inflated, unreasonable, and/or supra-competitive deductibles, co-pays, and other expenses to third party medical providers. These

deductibles, co-pays, and other expenses were higher than the Plaintiffs would have paid but for the Sherman Act violations.

168.    These damages further consist of being deprived of the opportunity to purchase health insurance from one or more of the other Blue Plans and/or their non-Blue Brand affiliates at a lower premium or contractual rate and/or at a price set by a market free from the non-price restraints imposed by the Defendants' anticompetitive agreements.

169.    These damages also consist of being deprived of the opportunity to purchase health insurance policies that offered better services and greater coverage that would result from competition in the marketplace. The Plaintiffs have also been deprived of consumer choice and increased innovation.

WHEREFORE, the Plaintiffs demand judgment against the Defendants as follows:

(a)    finding the Defendants violated 15 U.S.C. § 2;

(b)    granting the Plaintiffs treble damages pursuant to 15 U.S.C. § 15(a);

(c)    awarding the Plaintiffs costs incurred in this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 15(a); and

(d)    granting any further legal or equitable relief the Court deems just and proper.

## COUNT III — INJUNCTIVE RELIEF FOR VIOLATIONS OF 15 U.S.C. §§ 1, 2, AND 3 (AS TO ALL DEFENDANTS)

170.    The Plaintiffs reallege and incorporate by reference, the allegations set forth above in paragraphs 1 through 169 as if set forth here in full.

171.    As alleged in Count I of this Complaint, the Defendants have conspired to unreasonably restrain trade in violation of §§ 1 and 3 of the Sherman Act.

172.    In the pending class action against the Defendants, which the Plaintiffs have opted out of, the Court held that "Plaintiffs have presented evidence of an *aggregation of competitive restraints*—namely, the adoption of ESAs and, among other things, best efforts rules—which,

considered together, constitute a *per se* violation of the Sherman Act." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 1266–67 (emphasis added).

173.    Thus, the horizontal market allocation agreements and output restrictions between the Defendants are *per se* illegal under §§ 1 and 3 of the Sherman Act. That ruling, which was affirmed on appeal by the Eleventh Circuit, is *res judicata* for purposes of this action. *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 18-90020-E, 2018 WL 7152887, 2018 U.S. App. LEXIS 36905 (11th Cir. Dec. 12, 2018).

174.    Further, as alleged in Count II of this Complaint, the anticompetitive restrictions challenged herein, represent overt acts in furtherance of the Defendants' efforts to monopolize. By willfully creating or maintaining or attempting to create or maintain a monopoly, the Defendants have violated § 2 of the Sherman Act.

175.    As a direct and proximate result of the Defendants' continuing violations of §§ 1, 2, and 3 of the Sherman Act, the Plaintiffs have suffered actual or threatened injury as described in this Complaint.

176.    If the Defendants' actions are not enjoined, harm to competition and injury to the Plaintiffs will continue.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants as follows:

(a)    enjoining the Defendants from entering into, honoring, or enforcing any agreements that that have the actual and intended effect of restricting their ability to compete with each other, either directly or through their non-Blue Brand affiliates pursuant to 15 U.S.C. § 26;

(b)    awarding the Plaintiffs costs incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 26; and

(c)    granting any further legal or equitable relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

Dated September 27, 2021.

Respectfully Submitted By:

Gulisano Law, PLLC
5645 Coral Ridge Drive, Suite 207
Coral Springs, FL 33076
954-947-3972
michael@gulisanolaw.com

s/ Michael Gulisano
Michael Gulisano, Esquire
Florida Bar No.: 87573